**Case No. 23-4117**

---

In the United States Court of Appeals
for the Tenth Circuit

---

**United States of America**,
Plaintiff-Appellee,

v.

**Perry Maryboy,**
Defendant-Appellant.

---

On Appeal from the United States District Court
for the District of Utah (Southern Region)
The Honorable David Nuffer, District Judge
D.C. Case No. 4:18-cr-00119-DN-1

---

**Appellant's Opening Brief**

---

Office of the Federal Public Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
Tel: (303) 294-7002
Fax: (303) 294-1192
Email: Jacob_Rasch-Chabot@fd.org

Virginia L. Grady
Federal Public Defender

Jacob Rasch-Chabot
Assistant Federal Public Defender

Attorneys for Appellant
Perry Maryboy

Oral argument is requested.

June 21, 2024

# Table of Contents

Table of Authorities ......................................................................................... iv

Prior or Related Appeals................................................................................... v

Jurisdiction....................................................................................................... 1

Issue Presented ................................................................................................ 1

Introduction ..................................................................................................... 1

Statement of the Case ...................................................................................... 3

    I.    At trial, the only disputed element is whether Mr. Maryboy acted with the requisite mens rea............................................................................... 3

    II.   Agent Olson testifies that Mr. Maryboy's conduct was "the ultimate expression of recklessness."........................................................................ 7

    III.  The jury is not instructed that, to convict Mr. Maryboy of second-degree murder, the government must disprove imperfect self-defense beyond a reasonable doubt. ................................................................................. 9

    IV.  In closing, the government's main theory is that Mr. Maryboy acted with extreme recklessness, and it expressly refers to Agent Olson's testimony. . 13

    V.   The jury finds Mr. Maryboy guilty on both counts, and the Court imposes a downward variant sentence of 300 months of imprisonment...................... 14

Summary of Argument ................................................................................... 15

Argument........................................................................................................ 16

    I.    The district court reversibly erred in allowing Agent Olson to testify that Mr. Maryboy's conduct was reckless. ........................................... 16

        A.   Preservation and standard of review. ................................................... 17

        B.   Agent Olson's testimony violates Rule 704(b). ...................................... 18

        C.   The error was plain. ............................................................................ 23

        D.   The impermissible testimony affected substantial rights. ....................... 24

        E.   The plain error warrants reversal. ......................................................... 29

    II.   The district court plainly erred in failing to instruct the jury that the government had to disprove imperfect self-defense beyond a reasonable doubt.............................................................................................. 30

        A.   Preservation and Standard of Review....................................................... 31

B.   The district court's second-degree murder instruction omitted the government's burden to disprove imperfect self-defense and erroneously indicated the jury could convict even if Mr. Maryboy subjectively acted in self-defense. ............................................................ 32

C.   The error is plain. ...................................................................... 37

D.   There is a reasonable probability the jury would not have convicted Mr. Maryboy of second-degree absent the error. ........................................... 38

E.   The fourth prong of plain error is satisfied. ............................................. 40

III.  This Court can reverse based on cumulative error. ........................................ 41

Conclusion .................................................................................................. 42

Statement Concerning Oral Argument ........................................................... 42

Certificate of Compliance .............................................................................. 43

**<u>Attachment</u>**

A. Judgment in a Criminal Case

## Table of Authorities

### Cases

*Diaz v. United States*, No. 23-14, 2024 WL 3056012 (U.S. June 20, 2024)... 15, 22, 24, 26

*Henderson v. United States*, 568 U.S. 266 (2013) .................................................................... 24

*In re Winship*, 397 U.S. 358, 364 (1970) ............................................................................. 32

*Mullaney v. Wilbur*, 421 U.S. 684 (1975) ........................................................................... 32

*United States v. Alvarez*, 837 F.2d 1024 (11th Cir. 1988) ...................................... 26

*United States v. Benford*, 875 F.3d 1007 (10th Cir. 2017) ...................................... 31

*United States v. Boyd*, 55 F.3d 667 (D.C. Cir. 1995) .............................................. 26

*United States v. Britt*, 79 F.4th 1280 (10th Cir. 2023) ............................................ 33

*United States v. Brooks*, 736 F.3d 921 (10th Cir. 2013) .......................................... 26

*United States v. Brown*, 287 F.3d 965 (10th Cir. 2002) .......................................... 33

*United States v. Burgess*, 99 F.4th 1175 (10th Cir. 2024) ...................................... 17

*United States v. Cantu*, 964 F.3d 924 (10th Cir. 2020) .......................................... 23

*United States v. Corrigan*, 548 F.2d 879 (10th Cir. 1977) .............................. 32, 34

*United States v. DeLoach*, 504 F.2d 185 (D.C. Cir. 1974) ...................................... 27

*United States v. Dennison*, 937 F.2d 559 (10th Cir. 1991) .............................. 21, 24

*United States v. Di-Domenico*, 985 F.2d 1159 (2d Cir. 1993) .............................. 26

*United States v. Griffith*, 65 F.4th 1216 (10th Cir. 2023) ...................................... 27

*United States v. Irvin*, 682 F.3d 1254 (10th Cir. 2012) .......................................... 27

*United States v. Jones*, 74 F.4th 1065 (10th Cir. 2023) .............................. 18, 29, 31

*United States v. Levine*, 80 F.3d 129 (5th Cir. 1996) .............................................. 22

*United States v. Lofton*, 776 F.2d 91810th Cir. 1985) .............................. 32, 33

*United States v. Richard*, 969 F.2d 849 (10th Cir. 1992) ...................................................... 18

*United States v. Salas*, 889 F.3d 681 (10th Cir. 2018) ........................................................... 24

*United States v. Starks*, 34 F.4th 1142 (10th Cir. 2022) ........................................................ 24

*United States v. Toledo*, 739 F.3d 562 (10th Cir. 2014) ........................................................ 33

*United States v. Tome*, 61 F.3d 1446 (10th Cir. 1995) .......................................................... 24

*United States v. Venjohn*, --- F.4th ---, 2024 WL 2886831 (10th Cir. 2024) ...................... 37

*United States v. Wood*, 207 F.3d 1222 (10th Cir. 2000) ................................... 18, 19, 21, 23

**Statutes**

18 U.S.C. § 1111 ...................................................................................................................... 3

18 U.S.C. § 1111(a) ................................................................................................................. 20

18 U.S.C. § 1153(a) ................................................................................................................... 3

18 U.S.C. § 3231 ....................................................................................................................... 1

18 U.S.C. § 3742(a) ................................................................................................................... 1

18 U.S.C. § 924(c)(1)(A)(iii) ..................................................................................................... 3

18. § 2A1.4(a)(2)(A) ................................................................................................................ 30

28 U.S.C. § 1291 ....................................................................................................................... 1

**Rules**

Fed. R. Evid. 704(b) ...................................................................... 18, 19, 20, 21, 22, 24, 25

**Sentencing Guidelines**

38. U.S.S.G. § 2A1.2 ............................................................................................................... 29

## Prior or Related Appeals

None.

## Jurisdiction

The district court had jurisdiction over this federal criminal case under 18 U.S.C. § 3231. The district court entered judgment on August 29, 2023. R. vol. 2 at 622.[1] Mr. Maryboy filed a notice of appeal on September 6, 2023. *Id.* at 630. This Court has appellate jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## Issues Presented

I.      Did an expert witness's testimony that Mr. Maryboy's conduct was "reckless" violate Rule 704(b)?

II.     Did the district court plainly err in failing to instruct the jury that the government had to disprove imperfect self-defense beyond a reasonable doubt in order to prove he was guilty of second-degree murder?

III.    Do these two errors cumulatively require reversal?

## Introduction

Perry Maryboy, a 54-year-old electrician, was driving home from work when he decided to pull over on the side of a rural road on Navajo Nation land, in a spot where he knew he'd have good reception. He parked where the county road intersected with a small dirt road and stayed for a while to use his cell phone.

Antonio Montowine and Rachel Green were driving down the same county road with Ms. Green's son in the back of the van. It was Ms. Green's birthday and they had been drinking heavily throughout the day. When they saw Mr. Maryboy

---

[1] Record citations are to the volume filed in this Court and the page number in the bottom, right-hand corner of each page.

parked there, they made a U-turn and parked behind him. Evidently, the dirt road led to an area that Ms. Green (incorrectly) considered her family's land, and she wanted Mr. Montowine to tell Mr. Maryboy to leave. Mr. Montowine got out of the van and approached Mr. Maryboy's truck on the passenger's side.

The details of the confrontation are disputed, but it ended when Mr. Maryboy fired two shots from his revolver, the second of which struck Mr. Montowine on the back right side of his head, killing him instantly. According to Mr. Maryboy, Mr. Montowine was aggressive, and Mr. Maryboy feared for his safety, so he fired two warning shots in the air. Mr. Maryboy didn't know how the second shot hit Mr. Montowine, but he guessed that it accidentally went off prematurely as he was raising the firearm in the air.

Mr. Maryboy was indicted on one count of second-degree murder and one count of discharging a firearm during and in relation to a crime of violence.

At trial, Mr. Maryboy stipulated, and the jury was instructed, that he killed Mr. Montowine, that he is an Indian, that the killing took place in Indian Country, and that second-degree murder was a crime of violence. Thus, the only disputed element at trial was whether Mr. Maryboy acted with "malice." Malice can be established by a mens rea of "extreme recklessness." It can also be negated if the defendant was acting in imperfect self-defense.

The jury found Mr. Maryboy guilty of both counts. However, two significant errors plagued the verdict.

First, the government's expert witness was permitted to testify that Mr. Maryboy's conduct was "the ultimate expression of recklessness." This clearly violated Rule 704(b)'s prohibition against experts offering an opinion about whether the defendant had the requisite mens rea. And second, the jury was not instructed that it was the government's burden to prove beyond a reasonable doubt that Mr. Maryboy was *not* acting in imperfect self-defense—i.e., that Mr. Maryboy subjectively acted in self-defense, albeit unreasonably. On the contrary, the instructions indicated that the jury could find him guilty even if he *was* subjectively acting in self-defense. Independently and cumulatively, these errors warrant reversal.

## Statement of the Case

Mr. Maryboy was indicted on one count of second-degree murder while within Indian County in violation of 18 U.S.C. § 1111, 1153(a), and one count of discharging a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii). R. vol. 1 at 76-77. Mr. Maryboy pled not guilty and proceeded to trial.

**I.    At trial, the only disputed element is whether Mr. Maryboy acted with the requisite mens rea.**

At trial, Mr. Maryboy stipulated, and the jury was instructed, that he killed Mr. Montowine, that he is an Indian, that the killing took place in Indian Country, and that second-degree murder was a crime of violence under 924(c). R. vol. 2 at 188. Thus, the only disputed element was whether Mr. Maryboy acted with "malice."

3

The government's key witness was Rebecca Green. *See* R. vol. 4 at 1113. She testified that April 13, 2018, was her 31st birthday. *Id.* at 1124. She and Mr. Montowine, who was her common-law husband, had bought six four-ounce shooters of whiskey to celebrate. *Id.* at 1127. After drinking and smoking marijuana at their home for a while that evening,[2] Ms. Green got upset about their lifestyle, specifically their drinking, and they decided to break up. *Id.* at 1131-33. They got in their van, along with her son, and started driving to her aunt's house to tell her about their breakup. *Id.* at 1133. On the way, Ms. Green remembered she had seen a dead cat on the side of county road 443 (also known as Red Mesa Road) earlier that day and wanted to see if it was her missing cat. *Id.* at 1136-37. As they were driving down county road 443, Mr. Montowine pointed out a white truck that was parked at the dirt road that leads to her grandma's old sheep-herding hogan. *Id.* at 1137-38. Mr. Montowine asked if he should pull over and tell the truck to leave, and Ms. Green said yes. *Id.* at 1138-38. Mr. Montowine made a U-turn, pulled up behind the white truck, and parked at an angle such that the van's driver's door opened up toward the back passenger side of the truck. *Id.* at 1140; *see* Gov't Ex. 2-3F.[3] Ms. Green was

---

[2] Ms. Green initially told investigators she drank a pint of vodka. R. vol. 4 at 1221. The autopsy report showed that Mr. Montowine's blood alcohol content at the time of his death was .237. *Id.* at 517. THC was also detected. *Id.*

[3] Gov't Exhibit 2-3F is a picture of a demonstrative exhibit used at trial to show the position of the vehicles and the people involved at the time of the fatal shooting, as recreated by Ms. Green. Mr. Maryboy will move to supplement the record on appeal with this exhibit.

frustrated that someone was on what she perceived to be her land,[4] but she maintained that Mr. Montowine was calm. *Id.* at 1139.

Ms. Green testified that she watched as Mr. Montowine approached the truck and knocked on the passenger side window. *Id.* at 1142. After less than a minute, Mr. Montowine walked back toward the middle of the truck bed, the driver got out of his truck, and they stood across from each other. *Id.* at 1143-44. Ms. Green stayed in the van and mostly could not hear what was being said, though she did hear Mr. Montowine say, "Oh, you have a .38." *Id.* at 1142, 1146. She then saw the driver holding a gun, pointing it up, and she maybe heard a gunshot. *Id.* at 1146. According to Ms. Green, she scooted over to the driver's side, got out of the van, and started yelling at the truck driver. *Id.* at 1147-48. Mr. Montowine came back to the driver's side of the van and calmly convinced her to get back in the van. *Id.* at 1148. As he was standing at the driver's door, he suddenly dropped to the ground. *Id.* at 1150. Ms. Green did not hear a gunshot, but eventually see could see that he had been shot in the head. *Id.* at 1150-51. The driver just stood there until she screamed at him. He then walked back to his truck and drove away. *Id.* at 1152-53. Ms. Green struggled to move Mr. Montowine's body out of the way of the van. *Id.* at 1156. Eventually she was able to move him, and she drove to her aunt's house for help. *Id.* at 1156-60.

---

[4] It was not, in fact, her land. The dirt road led to an area where grandmother once had a grazing permit. Mr. Maryboy's truck was pulled over on the public county road. *See* R. vol. 4 at 1080-99.

The government also presented evidence tending to show that Mr. Montowine died from a gunshot wound to the back, right side of his head and corroborating Ms. Green's account that Mr. Montowine was standing near the driver's side door when he was shot. *See, e.g.*, *id.* at 508, 596.

Mr. Maryboy testified in his defense. R. vol. 4 at 1573. According to Mr. Maryboy, he was on his way home from work when he pulled over on the side of the road to use his phone because he knew that location to have good cell phone service. *Id.* at 1575, 1597. He noticed a van drive by the opposite direction but did not realize it had pulled in behind him until suddenly a man appeared at his passenger window. *Id.* at 1615. The man was screaming expletives at him and had a crazy look in his eyes. *Id.* at 1619, 1666. Mr. Maryboy did not understand what the man wanted. He was afraid the man was armed and was going to harm him. *Id.* at 1624. So Mr. Maryboy got out of the truck and pulled out his revolver. *Id.* at 1625. He repeatedly told the man to show his hands, but he refused to do so. *Id.* at 1627. Instead, the man just stared blankly at him and continued to yell expletives. *Id.* Mr. Maryboy fired a warning shot in the air, but according to Mr. Maryboy, the man didn't even flinch. *Id.* at 1630. Mr. Maryboy fired a second warning shot, and this time the man immediately dropped to the ground. *Id.* at 1634. Mr. Maryboy testified that they were standing across the truck bed from each other, and when he dropped to the ground, Mr. Maryboy could not see him. *Id.* He didn't understand why the man dropped to the ground, but he fully expected him to get back up. *Id.* at 1641. When he didn't, Mr. Maryboy peaked

around the truck and saw him lying there. *Id.* at 1642. Still not understanding what happened, Mr. Maryboy got scared, got back in his truck, and drove away. *Id.* at 1643.

Although Mr. Maryboy did not believe he shot the man at the time, at trial he conceded that he did. His only theory as to what could have happened was that he must have accidentally prematurely fired the second warning shot as he was raising the gun in the air. *Id.* at 1640. Mr. Maryboy emphasized that he feared for his life, but he never intended to shoot the man. *Id.* at 1574 His intent was just to fire a second warning shot.[5]

## II. Agent Olson testifies that Mr. Maryboy's conduct was "the ultimate expression of recklessness."

The government's final witness was James Olson, an FBI agent and head firearms instructor. R. vol. 4 at 1483-85. Agent Olson reviewed the evidence in this case, including Mr. Maryboy's interrogation, the forensic firearms report, and the autopsy report. *Id.* at 1486-87. Agent Olson also test fired Mr. Maryboy's firearm. *Id.* at 1486-87. He generally testified that the firearm was functional and it was effectively "point of aim, point of impact," meaning that "wherever that weapon was pointed, that's where the bullet would ultimately land." R. vol. 4 at 1500.

Agent Olson also testified about the "cardinal" rules of gun safety. *Id.* at 1487-88. The "first is keep your finger off the trigger until you're ready to destroy whatever

---

[5] Indeed, even Ms. Green admitted on cross-examination that the second shot could have been accident and that she initially told investigators she thought it might have been an accident. *Id.* at 1258.

that weapon is pointed at." *Id.* at 1488. "The second is, treat every weapon as if it is loaded," meaning "you're never pointing it at anything you aren't willing to destroy." *Id.* "The third is, always keep your muzzle pointed in a safe direction." *Id.* "And the fourth is be aware of your target," including "what is beyond." *Id.*

The government then posed a "hypothetical" scenario to the witness. *Id.* at 1502. To demonstrate the hypothetical, the government referred Agent Olson to Exhibit 2-3F. This exhibit a was a picture of the demonstrative exhibit where Ms. Green used model vehicles and colored magnets to show where the vehicles were parked and where she, Mr. Maryboy, and Mr. Montowine were at the time of the fatal shooting. *See id.* at 1161-1174. In addition, the government added "hypothetical" details that the driver's side "door is open,"; "the door is not blocking a straight shot from the shooter"; "that a woman is seated in the passenger seat of the van"; "that a child is seated in the backseat of the van"; "that the person's back is to the shooter"; "that the shooter and person are approximately 6 to 8 feet apart"; the "shooter fires a bullet from [Mr. Maryboy's firearm] aimed at the back of the person's head"; and "the person is shot in the back of the head." *Id.* at 1503. In other words, the government's hypothetical perfectly tracked Ms. Green's version of events. The government then asked whether there were "any cardinal rules of safety that are being violated by the shooter in this hypothetical." *Id.* at 1505.

Agent Olson testified that all four cardinal rules of gun safety were violated and further opined that "it was being at least cavalier, if not gross – grossly negligent reckless to point a loaded weapon at another person." *Id.* at 1505.

The government returned to this line of questioning in its redirect examination. This time it added the new wrinkle that the shooter inadvertently fired Mr. Maryboy's firearm at the victim's head while he was raising it up in an attempt to shoot a warning shot into the air. *Id.* at 1539. Again, Agent Olson testified that all four cardinal rules of gun safety were violated in that hypothetical, and that such conduct was "reckless." *Id.* at 1540. The government probed further, asking "how reckless is that act?"

Defense counsel objected. *Id.* at 1540-41 ("I'm going to object to the form of the question."). The district court overruled the objection. *Id.* at 1541.

Agent Olson opined, "Any time that you handle a weapon in an unsafe manner it could take another human life. And to me that's the ultimate expression of recklessness." *Id.* at 1541.

The government proceeded to ask whether the conduct was "extremely reckless." *Id.* Again, defense counsel objected, and this time the district court sustained the objection. *Id.* at 1541.

## III.    The jury is not instructed that, to convict Mr. Maryboy of second-degree murder, the government must disprove imperfect self-defense beyond a reasonable doubt.

Before trial, Mr. Maryboy and government jointly proposed final jury instructions to the district court. R. vol. 1 at 158. One proposed instruction set forth

9

four elements of second-degree murder: (1) the defendant killed Mr. Montowine; (2) with malice aforethought; (3) the defendant is an Indian; and (4) it took place in Indian Country. *Id.* at 183. Four additional instructions further defined each element. *Id.* at 184-88.

The instructions on the lesser included offense of involuntary manslaughter followed a similar pattern. First, one instruction set forth five elements of the offense: (1) the defendant caused the death of Mr. Montowine; (2) "while committing a lawful act in an unlawful manner or without due caution and circumspection, which act might produce death"; (3) "the defendant knew," or it was foreseeable, "that his conduct was a threat to the lives of others"; (4) defendant is an Indian; and (5) it took place in Indian Country. Again, additional instructions further defined each element of the offense. *Id.* at 194-98.

Another proposed instruction discussed self-defense. *Id.* at 189-90. It generally provided that a murder is justified when a person subjectively believes they are in imminent danger and that their use of deadly force was reasonable. *Id.* at 189. It also specifically provided that in order to convict the defendant of second-degree murder, the jury "must find beyond a reasonable doubt that the government has satisfied its burden of proving that the defendant did not act in self-defense." *Id.* "Therefore, if you have a reasonable doubt whether or not the defendant acted in self-defense, your verdict as to second degree murder and the lesser included offense of involuntary manslaughter must be not guilty." *Id.*

10

The parties' submission also included an instruction on imperfect self-defense. *Id.* at 192. It explained that imperfect self-defense would apply if Mr. Maryboy "caused the death" of the victim "while defending himself," but did so "in an unlawful manner by using excessive force." *Id.* Importantly, as in the self-defense instruction, it specifically provided that "before you may convict the defendant of second degree murder, you must find beyond a reasonable doubt that the defendant did not act in imperfect self-defense." *Id.* "Therefore, if you have a reasonable doubt about whether or not the defendant acted in imperfect self-defense as described above, your verdict on second degree murder must be not guilty and you should then proceed to consider the lesser included offense of involuntary manslaughter . . . ." *Id.*

In an email to counsel, the district court proposed 5 new instructions to replace 18 of the jointly proposed instructions, including the 12 discussed above. R. vol. 2 at 259. According to the email, "the Judge felt it necessary to prepare revised proposed elements instructions that more closely follow the Tenth Circuit Pattern Instructions." *Id.* "The Judge believe[d] the revised proposed elements instructions contain more accurate and accepted statements of the law, and are less complex and numerous." *Id.* However, in the district court's process of winnowing and consolidation, at least one significant detail was lost in the shuffle. That is, the new instructions omitted that it was the government's burden to prove beyond a reasonable that Mr. Maryboy was *not* acting in *imperfect* self-defense before the jury could convict him of second-degree murder.

11

The district court's first new instruction replaced the parties' five proposed instructions on the elements of second-degree murder. *Id.* at 261, 270-74. Notably, it added a fifth element the government was required to prove beyond a reasonable doubt: that "the defendant did not act in self-defense, or it was not reasonable for the defendant to think that the force he used was necessary to defend himself against an immediate threat." *Id.* at 261. As explained below, this new element addresses only the full justification defense of self-defense, not the partial defense of imperfect self-defense.

The district court's second instruction consolidated the parties' proposed instructions on self-defense and retreat. *Id.* at 263, 275-77.

The third instruction purported to replace the parties' imperfect self-defense instruction and their instruction explaining the process for considering a lesser-included offense. *Id.* at 264, 278-79. However, the instruction did not actually address imperfect self-defense.

The doctrine of imperfect self-defense was referenced, though not by name, only in the fourth new instruction, which purported to replace the parties' five separate instructions on the elements of involuntary manslaughter. *Id.* That is, the instruction provided, "A person may commit involuntary manslaughter if he acts in self-defense, but it was not reasonable for him to think that the force used was necessary to defend himself against an immediate threat." *Id.* at 266. Thus, nowhere did the new instructions state it was the government's burden to disprove imperfect

self-defense beyond a reasonable doubt in order to secure a conviction on second-degree murder.

Neither defense counsel nor the government noted this omission, nor did either party object to the district court's new instructions (although each did suggest some minor edits not relevant to this appeal). *See id.* at 291-92, 340.

Accordingly, at the close of evidence, the jury was not instructed that it could only convict Mr. Maryboy of second-degree murder if the government proved beyond a reasonable doubt that Mr. Maryboy did *not* act in *imperfect* self-defense—i.e., that Mr. Maryboy was subjectively acting in self-defense, albeit unreasonably.

## IV. In closing, the government's main theory is that Mr. Maryboy acted with extreme recklessness, and it expressly refers to Agent Olson's testimony.

In closing, the government briefly asserts that Mr. Maryboy intended to kill Mr. Montowine or intended to cause him serious bodily injury. *Id.* at 1791-92. But it primarily focuses on its theory that Mr. Maryboy was guilty of second-degree murder because his conduct in pointing a loaded firearm at Mr. Montowine was extremely reckless. *Id.* at 1792-95. Indeed, the government argued that the jury should find Mr. Maryboy guilty of extreme-recklessness murder even based on Mr. Maryboy's own account. *Id.* at 1793 ("I'll submit to you, even if . . . you accept his version as told from the stand yesterday, there is no question that he acted extremely reckless."). According to the government, that's because Mr. Maryboy "admitted that the gun

13

came up directly in line with Mr. Montowine's body. That gun was pointed right at him as he took it up." *Id.* at 1793-94.

In support of this theory, the government specifically directed the jury to Agent Olson's testimony that Mr. Maryboy's actions were extremely reckless because they violated the cardinal rules of gun safety:

> Do you remember the testimony of Jim Olson? We talked about that. I talked about that with him. Remember that? He talked about all of those cardinal rules of gun safety that were being broken by that – by that act. Finger on trigger, . . . gun not pointed in a safe direction. . . . [I]f you somehow conclude that that's what he did, that as that gun was coming up it was pointed directly in Mr. Montowine's direction, and that was about as reckless as it gets. And when you go back there and you deliberate and you're thinking about whether that was reckless, ask yourselves: What could be more reckless than that, other than doing what he did, pointing it at his head and firing it?

*Id.* at 1794.

As for voluntary manslaughter, the government urged the jury, "you don't even have to go to [that] instruction" because "the defendant committed second degree murder by, at the bare minimum, acting with extreme recklessness." *Id.* at 1795.

## V.    The jury finds Mr. Maryboy guilty on both counts, and the Court imposes a downward variant sentence of 300 months of imprisonment.

The jury returned a verdict finding Mr. Maryboy guilty of both second-degree murder and violating 18 U.S.C. § 924(c). R. vol. 2 at 239-40.

A presentence report (PSR) determined that Mr. Maryboy's offense level on the second-degree murder conviction was 38. R. vol. 3 at 57. With zero criminal history points, Mr. Maryboy was a criminal history category I. *Id.* at 52. That resulted in a

guideline range of 235 to 293 months of imprisonment on count one alone. *Id.* at 57. The 924(c) conviction carried a mandatory minimum of 10 years of imprisonment consecutive to any other sentence. *Id.* at 57-58. Accordingly, Mr. Maryboy's total guidelines range was 355 to 413 months of imprisonment. *Id.* at 58.

The district court granted Mr. Maryboy a downward variance to 180 months of imprisonment on count 1 and imposed the mandatory minimum of 10 years on count 2, for a total of 300 months of imprisonment. R. vol. 2 at 624.

Mr. Maryboy timely filed a notice of appeal. *Id.* at 630.

## Summary of Argument

I.    Rule 704(b) provides, "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b). Thus, an expert cannot "expressly draw the conclusion" that a defendant "acted with the necessary mens rea." *United States v. Wood*, 207 F.3d 1222, 1236 (10th Cir. 2000). Here, Agent Olson repeatedly testified that Mr. Maryboy's conduct was "reckless." In doing so, he clearly violated Rule 704(b). That Agent Olson opined only that a *hypothetical person* was reckless does not render his testimony permissible. Indeed, the Supreme Court just recently made clear that Rule 704(b) bars an expert's testimony that a hypothetical person in the defendant's shoes has the requisite mental state. *Diaz v. United States*, No. 23-14, 2024 WL 3056012 (U.S. June 20, 2024).

15

II.     When a defendant raises an affirmative defense that negates an essential element of the offense, such as malice, the jury must be instructed that the government has the burden to *disprove* the affirmative defense beyond a reasonable doubt. *See United States v. Lofton*, 776 F.2d 918, 921 (10th Cir. 1985). Here, the district court failed to instruct the jury that the government had to prove beyond a reasonable doubt that Mr. Maryboy did *not* act in imperfect self-defense, an affirmative defense that negates malice, *see United States v. Britt*, 79 F.4th 1280, 1287 n.2 (10th Cir. 2023). Not only that, the second-degree murder instruction erroneously indicated that the jury could find him guilty even if he was subjectively acting in self-defense, which is the essential element of imperfect self-defense. These instructional errors warrant reversal.

III.     Even assuming for the sake of argument that neither error independently prejudiced Mr. Maryboy, this Court should reverse based on cumulative error.

<u>**Argument**</u>

**I.     The district court reversibly erred in allowing Agent Olson to testify that Mr. Maryboy's conduct was reckless.**

Rule 704(b) provides, "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b). Here, Agent Olson repeatedly

16

testified that Mr. Maryboy's conduct was "reckless." In doing so, he clearly violated Rule 704(b).

### A.    Preservation and standard of review.

Defense counsel did not immediately object when Agent Olson first testified that Mr. Maryboy's conduct was "grossly negligent reckless." R. vol. 4 at 1505. However, when the government continued this line of questioning on redirect examination, counsel objected to the government's question, "how reckless is that act?" *Id.* at 1540-41. The objection was overruled, and Agent Olson answered that Mr. Maryboy's conduct was "the ultimate expression of recklessness." *Id.* at 1541. Counsel objected to the government's follow up question as to how his conduct compared to "extreme recklessness," and that objection was sustained.

At a minimum, Mr. Maryboy's objection preserved his claim of error as to Agent Olson's testimony that Mr. Maryboy's conduct constituted "the ultimate expression of recklessness." Arguably, however, it is sufficient to preserve his claim of error as to the entire line of questioning. Indeed, under similar circumstances, this Court recently held that such interspersed objections to the form of questioning was sufficient to preserve a claim of error as to the entire line of questioning, even where defense counsel failed to immediately object. *United States v. Burgess*, 99 F.4th 1175, 1189 (10th Cir. 2024) ("Burgess acknowledges not initially objecting to this line of questioning. But, because he eventually did intersperse objections during this

17

challenged cross-examination, we will review this prosecutorial misconduct argument de novo.").

To the extent that Mr. Maryboy's claim is preserved, this Court's review is for abuse of discretion. *See United States v. Wood*, 207 F.3d 1222, 1235 (10th Cir. 2000) ("A district court's decision to admit evidence, including expert testimony, is reviewed under an abuse of discretion standard."). If unpreserved, this Court reviews for plain error. *United States v. Jones*, 74 F.4th 1065, 1068 (10th Cir. 2023). Under that standard, this Court will reverse "when there is '(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (citation omitted).

Mr. Maryboy maintains his claim is preserved. However, in an abundance of caution, and because he can prevail under either standard, Mr. Maryboy will assume for the sake of argument that the more onerous plain error standard applies.

## B.    Agent Olson's testimony violates Rule 704(b).

Rule 704(b) provides, "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b). In other words, an expert cannot "expressly draw the conclusion" that a defendant "acted with the necessary mens rea." *United States v. Wood*, 207 F.3d 1222, 1236 (10th Cir. 2000) (quoting *United States v. Richard*, 969 F.2d 849, 855 (10th Cir. 1992)). That's exactly what Agent Olson did

18

here. He repeatedly opined that Mr. Maryboy's conduct was reckless—e.g., "gross negligent reckless," "reckless," and "the ultimate expression of recklessness"—and recklessness is a qualifying mens rea for both second-degree murder and the lesser included offense of involuntary manslaughter. Accordingly, his testimony violated Rule 704(b).

*United States v. Wood* is directly on point and dispositive of this issue. There, this Court held that the government's expert's "testimony that [the defendant's] actions were reckless" violated Rule 704(b) because it "specifically described the mens rea for manslaughter." *Id.* at 1236. This was true even though the expert's testimony was "not cast in precisely the same terminology as the statute, case law, or instruction." *Id.* It was enough that the testimony "recite[d] the critical components" of the requisite mens rea. *Id.* As this Court explained, "the mens rea for involuntary manslaughter is 'without due care and circumspection' or 'gross negligence.'" *Id.* (citations omitted). However, these terms were further defined in the instructions as "a wanton, *reckless*, or indifferent or conscious disregard for human life or the safety of others." *Id.* (emphasis in original). The expert testified that the defendant's "actions were 'reckless' because they were 'fraught with the perils of causing death.'" *Id.* This Court held such testimony was "substantively indistinguishable from the instruction that the mens rea for involuntary manslaughter is met if the defendant's actions demonstrate a 'reckless . . . disregard for human life.'" *Id.* (ellipsis in original). Such "testimony necessarily dictates the final conclusion that [the defendant] possessed the requisite mens rea for

19

involuntary manslaughter." *Id.* Thus, this Court concluded, it was "precisely the sort of testimony Rule 704(b) is designed to prevent." *Id.*

The same is true here. Officer Olson's testimony as to the recklessness of Mr. Maryboy's actions violated Rule 704(b) because it specifically described the mens rea for second-degree murder. Second-degree murder is the unlawful killing of another "with malice aforethought." 18 U.S.C. § 1111(a). As the district court instructed the jury, malice "may be established by evidence of conduct that is *reckless* and wanton, and a gross deviation from a reasonable standard of care, of such a nature that it can be reasonably inferred that the defendant was aware of a serious risk of death or serious bodily harm." R. vol. 2 at 219 (emphasis added). Moreover, while the instructions acknowledged that the mens rea for second-degree murder and manslaughter were similar, they distinguish second-degree murder as involving "reckless and wanton disregard for human life that is extreme in nature." *Id.* at 223.

Consistent with this definition, Agent Olson testified that it was "grossly negligent reckless to point a loaded weapon at another person," that it was "reckless" to point a loaded firearm at the victim when there was a woman and child behind him, and that such conduct is "the ultimate expression of recklessness" because "[a]ny time you handle a weapon in an unsafe manner it could take another human life." R. vol. 4 at 1540-41. As in *Wood*, Agent Olson's testimony was "substantively indistinguishable from the instruction" for the mens rea of second-degree murder.

That is, while the second-degree murder instruction says the conduct must be "*reckless* and wanton," Agent Olson's testimony repeatedly referred to Mr. Maryboy's conduct as "reckless." The instruction uses the phrase "gross deviation from a reasonable standard of care," and Agent Olson used the materially indistinguishable term "grossly negligent." And finally, whereas the instruction differentiates murder from manslaughter on the basis that murder involves "reckless[ness] . . . that is extreme in nature," Agent Olson testified that Mr. Maryboy's conduct constituted "the ultimate expression of recklessness." Accordingly, even if "not cast in precisely the same terminology as the statute, case law, or instruction," Agent Olson's testimony clearly "recite[d] the critical components" of the requisite mens rea. *Wood*, 207 F.3d at 1236. In doing so, his testimony "necessarily dictates the final conclusion that [the defendant] possessed the requisite mens rea." *Id.* Thus, it is "precisely the sort of testimony Rule 704(b) is designed to prevent," *id.*, and the district court erred in admitting it.

To be clear, that Agent Olson opined only that a *hypothetical person* was reckless does not render his testimony permissible. It has long been established in this Circuit and a majority of others that Rule 704(b) cannot be circumvented by speaking in terms of a hypotheticals. *See United States v. Dennison*, 937 F.2d 559, 565 (10th Cir. 1991) ("Although Dr. Siegal's testimony was premised on a hypothetical person suffering borderline personality disorder and couched in terms of the characteristics of the illness itself, the necessary inference was that the instant defendant did not have

21

the capacity to form specific intent at the time of his crimes because of the combined effects of his intoxication and mental illness. Under Rule 704(b) such an inference is for the jury to make, not an expert witness."). *United States v. Levine*, 80 F.3d 129, 134 (5th Cir. 1996) ("The majority opinion in other circuits appears to be that under Rule 704(b) hypothetical questions mirroring the fact patterns of the evidence in the trial case are violative of the rule when the answering testimony contains a necessary inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.").

Indeed, the Supreme Court just confirmed this in *Diaz v. United States*, No. 23-14, 2024 WL 3056012 (U.S. June 20, 2024). There, the Supreme Court held that an expert's opinion that "*most* drug couriers know they are transporting drugs" did not violate Rule 704(b) because "the expert witness did not state an opinion about whether petitioner herself had a particular mental state." *Id.* at *2 (emphasis added). However, the Court clarified that the rule *is* violated where an expert opines that "all people in the defendant's shoes" have the requisite mental state. *Id.* at *5. "The phrase 'all people in the defendant's shoes' includes, of course, the defendant himself. So, when the expert testified that all people in the defendant's shoes" have the requisite mental state, "the expert also opined that the defendant had that mental state." *Id.* "The expert thus stated an opinion on the defendant's mental state, an ultimate issue reserved for the jury, in violation of Rule 704(b)." *Id.* Indeed, the government conceded that Rule 704(b) "bars an expert from opining that a hypothetical person

who matches the defendant's description (say, a hypothetical woman who drives a car full of drugs across the border) will have the mental state required for conviction." *Id.* at *11 (Gorsuch, J., dissenting).

That's precisely what happened here. The "hypothetical" scenario the government presented matched the circumstances of this case to a tee. The government referred Agent Olson to Exhibit 2-3F, a model of the scene of the shooting as recreated by Ms. Green. And it added more specific details of the offense including that the driver's door was open, a woman and child were seated in the van, the victim had their back to the shooter, the firearm was pointed at the victim's head when it was fired, and the firearm was Mr. Maryboy's actual firearm. Based on this scenario, Agent Olson opined without qualification that the shooter's conduct was the ultimate expression of recklessness. In doing so, Agent Olson "stated an opinion on the defendant's mental state, an ultimate issue reserved for the jury, in violation of Rule 704(b)." *Id.*

### C.    The error was plain.

An error is plain "if it is clear or obvious under current, well-settled law of this court or the Supreme Court." *United States v. Cantu*, 964 F.3d 924, 935 (10th Cir. 2020) (citation omitted). In light of this Court's opinion in *Wood*, it is clear and obvious that an expert may not testify that a defendant's conduct is reckless where recklessness is a component of the mens rea of the offense. *Wood*, 207 F.3d at 1236. And the Supreme Court's decision in *Diaz* makes clear the rule bars an expert's testimony that a

23

hypothetical person in the defendant's shoes has the requisite mental state. *Diaz*, 2024 WL 3056012, at *5.[6] Indeed, the government conceded as much. *Id.* at *11 (Gorsuch, J., dissenting). Accordingly, Agent Olson's testimony was clearly impermissible under current, well-settled law, and therefore the error is plain.

### D.    The impermissible testimony affected substantial rights.

To meet the third prong of plain error—an effect on substantial rights—Mr. Maryboy must demonstrate a "reasonable probability" that the outcome of the trial would have been different but for the error. To be clear, "[t]he question is not whether, omitting the inadmissible statements, the record contains sufficient evidence for a jury to convict the defendant." *United States v. Tome*, 61 F.3d 1446, 1455 (10th Cir. 1995) (citation omitted). Nor is the "reasonable-probability standard . . . the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." *United States v. Starks*, 34 F.4th 1142, 1157 (10th Cir. 2022). It is only whether there is a "reasonable probability" that the result would have been different. *United States v. Starks*, 34 F.4th 1142, 1157 (10th Cir. 2022). Mr. Maryboy can easily make that showing. At a minimum, there is a reasonable probability that, absent Agent Olson's

---

[6] Although *Diaz* was decided after Mr. Maryboy's trial, an "error is plain if it is 'clear or obvious at the time of the appeal.'" *United States v. Salas*, 889 F.3d 681, 686-87 (10th Cir. 2018) (citation omitted); *accord Henderson v. United States*, 568 U.S. 266, 276 (2013). In any event, as noted above, this Court has long held that Rule 704(b) cannot be circumvented by posing hypotheticals. *Dennison*, 937 F.2d at 565.

24

impermissible testimony as to the recklessness of Mr. Maryboy's conduct, at least one juror would have had reasonable doubt that Mr. Maryboy was guilty of second-degree murder, as opposed to involuntary manslaughter. Several factors contribute to this inevitable conclusion.

First, the inadmissible evidence bore directly on the only disputed element of second-degree murder. That is, Mr. Maryboy expressly stipulated that he fired the bullet that killed Mr. Montowine, that he was an Indian, and that the killing took place in Indian Country. He disputed only that he acted with the requisite mens rea of malice.[7] As discussed above, the malice element is satisfied if the defendant acted in "reckless and wanton disregard for human life that is extreme in nature." Agent Olson testified that Mr. Maryboy's conduct constituted the "ultimate expression of recklessness." In other words, Agent Olson impermissibly testified to the jury that the malice element—the only one in dispute—was satisfied. Such direct testimony was sure to have an effect on the jury.

Indeed, it is well known that expert opinions are uniquely persuasive to juries, particularly in this context—hence, the existence of Rule 704(b) in the first place. As the D.C. Circuit has explained:

> *[E]xpert* testimony on the ultimate issue of fact is likely to have a powerful effect on the result. If a jury has reason to be unsure of a defendant's guilt, but is made to listen to an 'expert' who claims to know the defendant's state of

---

[7] The jury was also instructed on self-defense as a fifth element. As discussed more below, self-defense negates the element of malice. In that sense, malice was the disputed element.

mind, the jurors may rely on the purported expertise of the Government witness to cure the ambiguity that they face. This is precisely what the Rule prohibits, for it is the jurors (not the expert) who must decide the ultimate issue of fact. There would be little need for a trial before a jury if an expert is allowed simply to declare the defendant's guilt.

*United States v. Boyd*, 55 F.3d 667, 672 (D.C. Cir. 1995); *accord United States v. Di-Domenico*, 985 F.2d 1159, 1164 (2d Cir. 1993) ("[T]he rule recognizes that expert testimony concerning a defendant's mental state poses a uniquely heightened danger of intruding on the jury's function.").

The risk of prejudice is compounded when the testifying expert is a police officer. Such expert "testimony by government agents is especially problematic because juries may place greater weight on evidence perceived to have the imprimatur of the government." *United States v. Brooks*, 736 F.3d 921, 931 (10th Cir. 2013) (citation omitted); *accord Diaz*, 2024 WL 3056012, at *8 (Jackson, J., concurring) ("When the expert is a government law enforcement agent testifying on behalf of the prosecution about participation in prior and similar cases, the possibility that the jury will give undue weight to the expert's testimony is greatly increased." (quoting *United States v. Alvarez*, 837 F.2d 1024, 1030 (11th Cir. 1988))). Thus, Agent Olson's impermissible expert testimony was likely to have an outsized influence on the jury.

Further increasing the likelihood that the error was prejudicial is that the government's closing emphasized that the jury should convict Mr. Maryboy of second-degree murder based on a mens rea of recklessness, and it even highlighted Agent Olson's testimony in support. *United States v. Griffith*, 65 F.4th 1216, 1220 (10th

26

Cir. 2023) ("[W]hen the prosecution uses closing argument to emphasize the disputed evidence, that emphasis could suggest an impact on the outcome."); *United States v. Irvin*, 682 F.3d 1254, 1264 (10th Cir. 2012) (recognizing that a prosecutor's "own estimation of his case . . . at the time" is "a highly relevant measure now of the likelihood of prejudice" (quoting *United States v. DeLoach*, 504 F.2d 185, 192 (D.C. Cir. 1974))). To be sure, the government's argument conclusorily asserted that Mr. Maryboy intended to kill Mr. Montowine or intended to cause him serious bodily injury. *See* R. vol. 4 at 1791-92. But its primary theory—the only one it discussed at length—was that Mr. Maryboy was guilty of second-degree murder because his conduct was extremely reckless. *Id.* at 1792-95. Indeed, the government argued that, even accepting Mr. Maryboy's testimony as true, his conduct was still extremely reckless. *Id.* at 1793. That's because Mr. Maryboy admitted that he had his finger on the trigger and pointed a loaded firearm at Mr. Montowine as he raised the firearm up. *Id.* at 1793-94. According to the government, this was extremely reckless because it violated the cardinal rules of gun safety. *Id.* at 1794. And in support of this theory, the government expressly referred the jury to Agent Olson's testimony. *Id.* at 1794 ("Do you remember the testimony of Jim Olson? We talked about that. I talked about that with him."). Thus, the government urged the jury to find Mr. Maryboy guilty of second degree based on the impermissible testimony of Agent Olson.

Finally, there is a reasonable probability of a different outcome absent the impermissible testimony because the requisite mens rea for second-degree murder

and involuntary manslaughter are so similar. Even an experienced jurist, let alone a lay juror, should be forgiven for thinking them materially identical. According to the second-degree murder instruction, "Malice aforethought may be established by evidence of conduct that is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that it can be reasonably inferred that the defendant was aware of a serious risk of death or serious bodily harm." R. vol. 2 at 219. The involuntary manslaughter instruction is phrased in synonymous terms: "[The prosecution] must prove more than that the defendant was merely negligent or that he failed to use reasonable care. The prosecution must prove gross negligence amounting to wanton and reckless disregard for human life." *Id.* at 223.

Although these descriptions are all but indistinguishable, the manslaughter instruction (though curiously not the second-degree murder instruction) clarifies that the difference is that second-degree murder is a wanton and reckless disregard that is "extreme in nature," while a manslaughter is not. Even with this distinction, the requisite mens reas are remarkably similar. As a result, there is a reasonable probability that, but for Agent Olson's impermissible testimony that Mr. Maryboy's conduct was "the ultimate exhibition of recklessness," at least one juror would have harbored reasonable doubt as to whether Mr. Maryboy's conduct was a reckless disregard that was "extreme in nature." Accordingly, there is a reasonable probability that but for the error, the jury would have convicted Mr. Maryboy only of involuntary manslaughter.

28

E.    **The plain error warrants reversal.**

This Court should vacate Mr. Maryboy's convictions because the error
seriously affects the fairness, integrity, or public reputation of judicial proceedings.
That is arguably true in any case where there is a reasonable probability that a
defendant would not have been convicted of an offense. *See Jones*, 74 F.4th at 1073
("'[B]ecause there is a reasonable probability that [the defendant] would not have been
convicted absent the error here, 'ignoring it would offend core notions of justice and
seriously affect the fairness, integrity, and public reputation of judicial proceedings.'")
It is especially true here. That's because, although a relatively fine line separates
second-degree murder and involuntary manslaughter, the difference in penalties was
devastating for Mr. Maryboy.

Second-degree murder is a "crime of violence" under 18 U.S.C. § 924(c), which
subjected Mr. Maryboy to a mandatory minimum of 10 years consecutive to his
second-degree murder sentence. Involuntary manslaughter is not a crime of violence.
Thus, had the jury found him not guilty of second-degree murder and guilty only of
involuntary manslaughter, he would not be serving a mandatory 10-year consecutive
sentence.

The difference in the guidelines range is even more dramatic. That is, the base
offense level for second-degree murder is 38. U.S.S.G. § 2A1.2. Because Mr. Maryboy
had zero criminal history points, his criminal history category was I. Thus, his
conviction for second-degree murder resulted in a guideline range of 235-293 months

29

plus 10 consecutive years for a total of 355-413 months, or about 30-34 years. R. vol. 3 at 57-58. Ultimately, the district court imposed a downward variance to 300 months, or 25 years. R. vol. 2 at 624.

By contrast, the base offense level for reckless involuntary manslaughter is just 18. § 2A1.4(a)(2)(A). With no § 924(c) conviction, his total guideline range for an involuntary manslaughter conviction would have been just 27 to 33 months, or about 2.5 years.

Accordingly, as a result of Agent Olson's impermissible testimony, there is a reasonable probability that Mr. Maryboy is overserving his appropriate sentence by decades. For a 60-year-old man with congestive heart failure, diabetes, and chronic kidney failure, among other significant health problems, *see* R. vol. 3 at 54, that is almost certainly the difference between dying in prison and someday having a life outside it.

Under these circumstances, the public would surely question the fairness, integrity, or public reputation of judicial proceedings were this Court to decline to grant him relief notwithstanding the plainness of the error.

## II.     The district court plainly erred in failing to instruct the jury that the government had to disprove imperfect self-defense beyond a reasonable doubt.

When a defendant raises an affirmative defense that negates an essential element of the offense, such as malice, the jury must be instructed that the government has the burden to *disprove* the affirmative defense beyond a reasonable

doubt to obtain a conviction. *See United States v. Lofton*, 776 F.2d 918, 921 (10th Cir. 1985). The district court failed to do that here. That is, the district court failed to instruct the jury that the government had to prove beyond a reasonable doubt that Mr. Maryboy did *not* act in imperfect self-defense, an affirmative defense that negates malice. *See United States v. Britt*, 79 F.4th 1280, 1287 n.2 (10th Cir. 2023). Not only that, the second-degree murder instruction erroneously provided the jury could find him guilty even if he was subjectively acting in self-defense, which is the essential element of imperfect self-defense. These instructional errors warrant reversal.

### A.     Preservation and Standard of Review.

Mr. Maryboy did not object to the district court's erroneous jury instruction. Accordingly, this Court's review is for plain error. *See United States v. Jones*, 74 F.4th 1065, 1068 (10th Cir. 2023). Mr. Maryboy can satisfy all four prongs of plain error, i.e., "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* This is particularly true given that this Court relaxes the plain error standard where, as here, there is potential constitutional error. *See United States v. Benford*, 875 F.3d 1007, 1016 (10th Cir. 2017) ("We apply plain error 'less rigidly when reviewing a potential constitutional error.'" (citation omitted)).

**B.**    **The district court's second-degree murder instruction omitted the government's burden to disprove imperfect self-defense and erroneously indicated the jury could convict even if Mr. Maryboy subjectively acted in self-defense.**

"The prosecution in a criminal case must prove beyond a reasonable doubt every element of the crime charged." *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985) (citing *In re Winship*, 397 U.S. 358, 364 (1970)). "To obtain a conviction for murder, the Government must establish beyond a reasonable doubt that the defendant acted with malice." *Id.* When a defendant raises an affirmative defense that negates malice, the government must prove beyond a reasonable doubt the *absence* of the defense. *See id.* ("[T]he prosecution must 'prove beyond a reasonable doubt the *absence* of the heat of passion on sudden provocation when the issue is properly presented in a homicide case.'" (quoting *Mullaney v. Wilbur*, 421 U.S. 684, 697-98 (1975))); *see also United States v. Corrigan*, 548 F.2d 879, 883 (10th Cir. 1977) (same as to self-defense because "it is directed toward negating the element of criminal intent").

"Failure to impose this requirement excepts the Government from its obligation under the Due Process Clause to prove the defendant guilty of murder beyond a reasonable doubt." *Lofton*, 776 F.3d at 920. Thus, this Court has held that, when a defendant has sufficiently raised such a defense, the jury must be instructed that the government has the burden to *disprove* the affirmative defense beyond a reasonable doubt to obtain a murder conviction. *See Lofton*, 776 at 921 ("[We] hold that a defendant in a federal murder case who has sufficiently raised a heat of passion

defense is entitled to instructions informing the jury of the theory of defense and of the Government's duty to prove beyond a reasonable doubt the absence of heat of passion in order to obtain a murder conviction."). Because imperfect self-defense is such a malice-negating affirmative defense, the district court erred in not instructing the jury on the government's burden to disprove it.

Imperfect self-defense is when a defendant subjectively "acts in self-defense but is criminally negligent in doing so." *United States v. Toledo*, 739 F.3d 562, 568-89 (10th Cir. 2014). In other words, "the defendant subjectively believed that the use of deadly force was necessary to prevent death or great bodily harm to himself or others, but his belief was not objectively reasonable." *United States v. Britt*, 79 F.4th 1280, 1287 (10th Cir. 2023). A defendant who acts in imperfect self-defense is not guilty of murder because the defense "operates to negate the malice element." *Id.* at 1287 n.2 (cleaned up). That is, "a defendant who proves an imperfect self-defense does not have the requisite mens rea to be guilty of [second]-degree murder." *Id.* Hence, in order to prove the element of malice beyond a reasonable doubt, it is the government's burden to prove beyond a reasonable doubt that a defendant was *not* acting in imperfect self-defense. *See Lofton*, 776 F.3d at 920.[8]

---

[8] Such a defendant "is not entitled to a complete acquittal, but rather 'is guilty of involuntary manslaughter.'" *Id.* (citation omitted). That's because a defendant who commits a killing "during an imperfect self-defense" has "caused the death while defending himself, a lawful act, but did so in an unlawful manner by using excessive force." *United States v. Brown*, 287 F.3d 965, 975 (10th Cir. 2002).

33

Here, Mr. Maryboy raised imperfect self-defense, R. vol. 1 at 192, testified that he feared for his life and believed he was acting in self-defense, *see, e.g.,* R. vol. 4 at 1624, 1702, and he argued as much to the jury, *see* R. vol. 4 at 1809, 1815, 1818. The jury was also instructed on the lesser included offense of involuntary manslaughter, which described the elements of imperfect self-defense and said they constituted involuntary manslaughter. But the jury was *not* instructed that the government bore the burden of proving beyond a reasonable doubt that Mr. Maryboy was not acting in imperfect self-defense. This was error.

To be sure, the district court did generally instruct the jury that it was the government's burden to prove every element beyond a reasonable doubt. But, as this Court has explained, that does not suffice to inform the jury of the government's burden to *disprove* an affirmative defense:

> In the case of an affirmative defense, however, the potential for misinterpretation is too great to permit ambiguity. An affirmative defense admits the defendant committed the acts charged, but seeks to establish a justification or excuse. In the absence of clear instructions, it is not unlikely that the jury would infer that the government has borne its burden and that it is up to the defendant to establish his justification. This is contrary to the standard of proof beyond a reasonable doubt on all elements of the offense; the defense of self-defense is directed toward negating the element of criminal intent.

*Corrigan*, 548 F.2d at 883.

In fact, the second-degree murder instruction strongly implied, if not expressly stated, the jury *could* convict Mr. Maryboy of second-degree murder even if it had reasonable doubt whether he subjectively believed he was acting in self-defense. That

is, it specifically provided that the government had to prove beyond a reasonable doubt that "the defendant did not act in self-defense, *or* it was not reasonable for the defendant to think that the force he used was necessary to defend himself against an immediate threat." R. vol. 2 at 219. This instruction adequately instructs the jury that it must disprove the complete defense of self-defense, but it does not account for imperfect self-defense.

The complete defense of self-defense (sometimes called "perfect" self-defense) is where the defendant both (1) subjectively acts in self-defense *and* (2) it was reasonable to do so. *Im*perfect self-defense is where the defendant (1) subjectively acts in self-defense, but (2) it was *not* reasonable. Thus, to disprove perfect self-defense, the government need only disprove *either* that the defendant was acting in self-defense, *or* that it was reasonable, and the jury was so instructed. However, in order to meet its burden to disprove *im*perfect self-defense, the government was required to disprove that first element of the defense, i.e., that the defendant subjectively acted in self-defense. The instructions said the opposite. By telling the jury the government only had to disprove one *or* the other, the instruction incorrectly provided that the jury could convict Mr. Maryboy of second-degree murder even if it had reasonable doubt as to whether he was subjectively acting in self-defense. This too was error.

*Lofton*, which dealt with the analogous "heat of passion" defense,[9] is dispositive here. There, the district court's instruction "define[d] heat of passion and state[d] that the Government must prove it beyond a reasonable doubt in order to secure a manslaughter conviction." *Id.* at 921. But this, the Court concluded, was "insufficient to inform the jury that, to obtain a conviction for murder, the prosecution must prove beyond a reasonable doubt that [the defendant] did *not* act in the heat of passion." *Id.* This was particularly true given that "the very structure of the charge precluded the jury from considering the effect of [the defendant's] heat of passion defense on the murder count." *Id.* That is, "the jury was instructed to consider manslaughter only if it found [the defendant] not guilty of murder." *Id.*

The same is true here. The only mention of the elements of imperfect self-defense was in the manslaughter instruction: "A person may commit Involuntary Manslaughter if he acts in self-defense, but it was not reasonable for him to think that the force used was necessary to defend himself against an immediate threat." R. vol. 2 at 224. And, as in *Lofton*, the structure of the charge meant that the jury would not consider involuntary manslaughter—and thus the elements of imperfect self-defense—unless it already found Mr. Maryboy not guilty of murder. R. vol. 2 at 222. Indeed, in closing, the government specifically urged the jury not to advance to the

---

[9] Heat of passion, like imperfect self-defense, negates the element of malice. *Lofton*, 776 F.2d at 920. A defendant who commits a "heat of passion" killing is guilty of voluntary manslaughter. *Id.*

manslaughter instruction because Mr. Maryboy was guilty of second-degree murder based on extreme recklessness. Accordingly, as in *Lofton*, the instructions were "insufficient to inform the jury that, to obtain a conviction for murder, the prosecution must prove beyond a reasonable doubt that [the defendant] did *not* act in [imperfect self-defense]." *Lofton*, 76 F.2d at 921.

Accordingly, the district court committed instructional error.

**C.    The error is plain.**

"Generally, an error is plain 'if it is clear or obvious under current, well-settled law of this court or the Supreme court.'" *United States v. Venjohn*, --- F.4th ---, 2024 WL 2886831 (10th Cir. June 10, 2024). In light of this Court's decision in *Lofton*, the error is plain. To be sure, *Lofton* concerned the affirmative defense of "heat of passion" whereas Mr. Maryboy's claim is as to "imperfect self defense." However, there is no meaningful distinction between the two in this context. That is, there is no conceivable reason why a district court would be required to instruct the jury of the government's burden to disprove heat of passion but it wouldn't be required to instruct the jury of the government's burden to disprove imperfect self defense. Both are affirmative defenses that reduce an offense from murder to manslaughter by negating the element of malice. Indeed, the entire justification for requiring such a burden instruction for heat of passion is that it negates the element of malice. Because imperfect self-defense likewise negates malice, *Lofton* clearly dictates that the same rule must apply to imperfect self-defense. At the very least, *Lofton* "sets forth a principle

37

clearly generalizable" to this context, which is sufficient to establish plainness.

*Venjohn*, 2024 WL 2886831, at *5.

> **D.    There is a reasonable probability the jury would not have convicted Mr. Maryboy of second-degree absent the error.**

Mr. Maryboy can meet the third prong of plain error because there is a "reasonable probability" that the outcome of the trial would have been different but for the error. That is, had the district court properly instructed the jury the government had to disprove imperfect self-defense beyond a reasonable doubt, there is a reasonable probability (i.e., less than a preponderance) that at least one juror would have had reasonable doubt that Mr. Maryboy was guilty of second-degree murder. Indeed, in *Lofton* this Court had no trouble concluding that this same instructional error "affects substantial and fundamental rights." 776 F.2d at 922. This Court should easily reach the same conclusion here.

First, it is important to note that the jury's verdict that Mr. Maryboy was guilty of second-degree murder does not negate the possibility that the jury would have found him guilty only of manslaughter if properly instructed. That's because it sheds no light on whether the jury believed or had any reasonable doubt as to whether Mr. Maryboy subjectively believed he was acting in self-defense. Recall that the jury was instructed only that it had to find beyond a reasonable doubt that Mr. Maryboy was acting in self-defense **_or_** that his belief was unreasonable. Thus, the jury's verdict on second-degree murder could have been (and most likely was) based on findings that

Mr. Maryboy was extremely reckless and that his use of force was unreasonable. In other words, the jury easily could have (and likely did) find Mr. Maryboy guilty of second-degree murder without considering whether, or at least without unanimously agreeing that, Mr. Maryboy was subjectively acting in self-defense. Accordingly, the jury's actual verdict does not undermine, let alone preclude, the reasonable probability that the jury would have reasonably doubted whether he was acting in imperfect self-defense.

Nor can we assume from the verdict that the jury generally found Mr. Maryboy not credible and extrapolate that they would have found his claim of subjective fear not credible. That's because, as the government argued to the jury in closing, even if it accepted his testimony as true—i.e., that he must have accidentally pulled the trigger prematurely as he was raising the firearm in the air—it could still find him guilty of second-degree murder based on a theory of extreme recklessness. Indeed, it is likely the jury did just that—accepted his testimony as true and still convicted him of second-degree murder (particularly in light of Agent Olson's inadmissible testimony, as discussed above). Thus, this Court cannot assume the jury found Mr. Maryboy's testimony generally not credible.

Finally, on this record, there is a reasonable probability that at least one juror would have found the government failed its burden to prove that Mr. Maryboy did not subjectively act in self-defense. After all, Mr. Maryboy was an older gentleman

with severe health problems.[10] He was alone on the side of the road in a remote, desolate area. A much younger, larger, and heavily intoxicated man[11] suddenly appeared at his window with a crazy look in his eyes and repeatedly hurled expletives at him. Under the circumstances, it is not hard to believe that Mr. Maryboy feared the worst and acted accordingly. Perhaps it was not reasonable for Mr. Maryboy to resort to shooting his firearm. But it is hard to believe that Mr. Maryboy would have done so even if he was not subjectively in fear and believed it was justified. Indeed, it is unfathomable that Mr. Montowine calmly approached Mr. Maryboy and politely asked him to leave, as Ms. Green testified, that Mr. Maryboy did not subjectively believe he was in any danger, yet Mr. Maryboy grabbed a firearm and shot Mr. Montowine anyway.

Accordingly, there is at least a reasonable probability that one juror would have found the government failed to prove beyond reasonable doubt that Mr. Maryboy did not subjectively act in self-defense.

### E.    The fourth prong of plain error is satisfied.

As discussed above, the mere fact that there is a reasonable probability that a defendant would not have been convicted of a greater offense but for the error is

---

[10] Mr. Maryboy was 54 years old at the time. He testified that he had diabetes, heart problems (quadruple bypass surgery following a heart attack), and had his thyroid removed. *Id.* at 1575.

[11] Mr. Montowine was approximately 6'2" weighing 280 pounds. R. vol. 4 at 1240. Mr. Maryboy is approximately 5'9." R. vol. 3 at 43. Mr. Montowine's BAC at the time of death was .237, nearly triple the legal driving limit.

reason enough for this Court to exercise its discretion to vacate the conviction. That is especially true here given that Mr. Maryboy is currently serving 25 *years* in prison, while his guideline range would have been just 27-33 *months* had he been convicted of involuntary manslaughter. Accordingly, the fourth prong of plain error review is satisfied.

## III.    This Court can reverse based on cumulative error.

If this Court agrees that the district court erred with respect to the Rule 704(b) violation and the instructional error, then it may proceed to consider whether the errors were prejudicial under a cumulative-error analysis. *See United States v. Starks*, 34 F.4th 1142, 1169-70 (10th Cir. 2022). That is, this Court may consider "whether their cumulative effect on the outcome of the trial is such that *collectively* they can no longer be determine to be harmless." *Id.* (citation omitted).[12] Given that these errors both went to the same disputed mens rea element, for the same reasons discussed above, there is a reasonable probability that they collectively affected the outcome of the trial. In other words, but for the errors, there is a reasonable probability that at least one juror would have found the government failed to prove second-degree murder beyond a reasonable doubt.

---

[12] This Court need not actually find the errors harmless before conducting a cumulative error analysis; it may simply assume without deciding the errors are individually harmless. *Starks*, 34 F.4th at 1170.

## Conclusion

This Court should vacate Mr. Maryboy's convictions and remand for further proceedings.

## Statement Concerning Oral Argument

Oral argument is requested because counsel believes it will aid the court's resolution of the issues raised in this appeal.

Respectfully submitted,

Virginia L. Grady
Federal Public Defender

By: */s/ Jacob Rasch-Chabot*
    Jacob Rasch-Chabot
    Assistant Federal Public Defender
    633 17th Street, Suite 1000
    Denver, Colorado 80202
    (303) 294-7002
    Email: Jacob_Rasch-Chabot@fd.org

## Certificate of Compliance

As required by Fed. R. App. P. 32(g)(1), I certify that this brief is proportionally spaced and contains 10,946 words.  I relied on my word processor to obtain the count, and the information is true and correct to the best of my knowledge.

*/s/Jacob Rasch-Chabot*
Jacob Rasch-Chabot
Assistant Federal Public Defender